**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA HOOKS, | ) | CASE NO.  5:15-CV-1296 |
| obo V.H., | ) | |
| | ) | JUDGE LIOI |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| Defendant. | | |

Plaintiff, Patricia Hooks ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Commissioner of Social Security ("the Commissioner"), denying the

application of Plaintiff's grandson, V.H. ("Claimant"), for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below,

the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED for proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

On September 22, 2011, Plaintiff filed an application for SSI on behalf of

Claimant, alleging a disability onset date of January 31, 2012. (Tr. 10.)  The application

was denied initially and upon reconsideration, and Plaintiff requested a hearing before

an administrative law judge ("ALJ").  (*Id*.)  On January 13, 2014, an ALJ conducted

Claimant's hearing.  (*Id*.)  Claimant was represented by an attorney. (*Id*.)  On March 13,

2014, the ALJ found Claimant not disabled.  (Tr. 10-23.)  On May 15, 2015, the Appeals

Council declined to review the ALJ's decision, and the ALJ's decision became the

Commissioner's final decision.  (Tr. 1.)

On June 30, 2015, Plaintiff filed a complaint on behalf of Claimant, a minor, to

challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed

briefing in this case. (Doc. Nos. 12, 13.)

Plaintiff asserts the following assignments of error: (1) the ALJ failed to afford

appropriate weight to the opinion of Claimant's treating psychologist, and (2) the ALJ

erred in finding that Claimant's impairments were nonsevere based on noncompliance

and reports of improvement.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Claimant was born in July 2002 and was a preschooler on the date Plaintiff filed

his application for SSI and a school-age child on the date the ALJ issued the disability

determination. (Tr. 13.)  He had not engaged in substantial gainful activity at any time

relevant to the disposition of his application.  (*Id*.)

### B.  Medical Evidence and School Reports

On April 2, 2011, the Claimant presented to Joseph Dull, M.S.N., for a mental

health assessment. (Tr. 307.)  Claimant's grandfather's main concern was that

Claimant had difficulty going to bed. (*Id*.)  Claimant's referring therapist had concerns

2

about possible attention deficit hyperactivity disorder ("ADHD"). (*Id.*)  Nurse Dull noted that Claimant's case had been opened three times since 2006 for destruction of property, hyperactivity, and temper tantrums. (*Id.*)  Claimant's grandfather indicated that Claimant had since "settled down." (*Id.*)  Claimant attended school at Akron Digital Academy, had repeated grades, and was earning a "B plus" average. (*Id.*)  Claimant's grandfather explained that Claimant was often slow to start assignments, but once he started them, he could stay on task and finish. (*Id.*)  Nurse Dull found that Claimant attended well, played quietly, and showed no signs of boredom, distractability, or inattention. (*Id.*)  The nurse recommended Melatonin for sleep. (*Id.*)

A March 2011 treatment note indicated that Claimant had not been treated at Child Guidance and Family Solutions for 70 days due to excessive stress in his home, including the death of a family member and his biological mother's decision to move out of the home. (Tr. 325.)

In May 2011, Claimant's grandfather reported to nurse Dull that Claimant's sleep had "greatly improved" with Melatonin. (Tr. 306.)  Claimant continued to struggle in math, but otherwise performed well in school. (*Id.*)  Nurse Dull noted that a report from Claimant's school showed ADHD symptoms, although Claimant's grandfather indicated he did not exhibit such symptoms at home. (*Id.*)  The nurse observed that Claimant had a conflict with his brother over toys while in the office, but much of the issue was instigated by Claimant's brother. (*Id.*)  Claimant's anger issues continued to decrease. (*Id.*)  Claimant's grandfather preferred to hold off on medication. (*Id.*)  Nurse Dull diagnosed disruptive behavior disorder and ruled out ADHD and oppositional defiant

3

disorder. (Tr. 293.)

On June 13, 2011, claimant presented to nurse Dull for a specialized assessment. (Tr. 304.)  On examination, Claimant's mood was pleasant and positive, but his affect was constricted and flat. (*Id.*)  Claimant's eye contact was poor, but he exhibited no unusual mannerisms or gestures. (*Id.*)  Claimant's grandparents reported that Claimant was resentful of his brother, more agitated, and off focus. (*Id.*)  They felt that he required medication. (*Id.*)  Nurse Dull prescribed Strattera for ADHD. (*Id.*)  Claimant failed to attend his appointment on June 27, 2011. (Tr. 302.)  On June 30, 2011, Nurse Dull reduced Claimant's dosage of Strattera because it caused adverse side effects, including sickness. (*Id.*)

In July 2011, Claimant returned to nurse Dull, and his grandfather reported that Claimant did not experience side effects on the lower dosage of Strattera. (Tr. 300.)  Claimant's moods were "decent," he handled conflicts better, and his sleep had improved, although it still took Claimant two hours to fall asleep. (*Id.*) He generally refused to eat anything other than fast food. (*Id.*)  Claimant missed his August 2011 appointment with nurse Dull due to a "work/school conflict." (Tr. 299.)

In October 2011, Claimant's grandparents reported to nurse Dull that Claimant had been disruptive in school. (Tr. 296.)  He had trouble sitting still, was impulsive, and struggled to complete work. (*Id.*)  Claimant also had continued conflicts with his brother. (*Id.*)  Nurse Dull described Plaintiff's mood as positive and pleasant and his affect as full and appropriate. (*Id.*)  Nurse Dull discussed other medications Claimant could try. (*Id.*)  Claimant missed his next appointment because a family member was ill. (Tr. 295.)

4

On November 9, 2011, nurse Dull recounted a report from Claimant's school that he "fantasize[d]", talked about his mother often, and refused to complete computer course work. (Tr. 340.)  Claimant's impulsive behaviors had improved, however, and he was getting along with his brother. (*Id.*)  During December 2011, Claimant's grandparents reported that Claimant said he wanted to hang himself. (Tr. 337.)  As a result, they stopped giving Claimant Strattera. (*Id.*)  Claimant had been agitated and grumpy, but more focused. (*Id.*)  Nurse Dull discussed the need for therapy on a more consistent basis and instructed Claimant to restart Strattera. (*Id.*)

On January 5, 2012, Claimant's grandmother told nurse Dull that she stopped giving Claimant Strattera, because she felt it caused fatigue and irritability. (Tr. 335.)  Claimant completed most of his work but had difficulty sitting still. (*Id.*)  He participated in the Boys and Girls Club and did well in the program, despite some peer conflicts. (*Id.*)  Claimant was sleeping well and had not made further comments about self-harm. (*Id.*)  He continued to argue with his brother. (*Id.*)  Nurse Dull recommended stopping Strattera for the time being. (*Id.*)

In February 2012, Claimant's grandmother reported to nurse Dull that Claimant was taking longer to fall asleep, but was doing better with class work. (Tr. 333.)  Claimant was taking his medication daily. (*Id.*)  He was still aggressive with his brother. (*Id.*)  During March 2012, Claimant's grandmother stated that they had stopped participating in group therapy sessions because they were overwhelmed with having to attend so often. (Tr. 331.)  Plaintiff was often up until one in the morning and his grandparents allowed to him sleep until one in the afternoon on days that he attended

5

online school from home. (*Id.*)  Claimant continued to have physical arguments with his brother. (*Id.*)  Nurse Dull increased Claimant's dosage of Intuniv for focus and sleep and talked about the need to structure Claimant's sleep schedule. (*Id.*)

On March 28, 2012, Aileen Mulaney, a school psychologist at Akron Digital Academy, evaluated Claimant as part of a larger team evaluation. (Tr. 377-80.) Claimant's grandmother reported that she did not give Claimant Intuniv or Melatonin on a daily basis. (Tr. 377.)  She explained that Claimant was moody, had a quick temper, and was physically aggressive with his brother. (*Id.*)  Recently, Claimant had begun crying when he did not get what he wanted. (*Id.*)  His grandmother also noted that Claimant's academic skills in reading, math, and writing were acceptable only when he had a good deal of help with homework. (Tr. 378.)  Ms. Mulaney noted that Claimant enrolled in Akron Digital Academy to finish kindergarten. (Tr. 379.)  Most academic work for the school was completed at home via computer, but students were also asked to attend lab twice weekly to receive individualized instruction and assistance from a teacher. (*Id.*)  Ms. Mulaney explained that in the first grade, Claimant was academically successful, but that his grades in math, science, and social studies had dropped dramatically in the second grade. (*Id.*)

In March 2012, Amy Sivak, one of Claimant's teachers, completed a report. (Tr. 381.)  She wrote that Claimant was doing very well in class, was mature and polite, and attended well to his work. (*Id.*)  He had improved greatly in reading and was able to remain on task and comprehend. (*Id.*)  Ms. Sivak was concerned about Plaintiff's writing abilities. (*Id.*)  Claimant participated enthusiastically and got along well with other

6

students and adults. (*Id.*)  Daniel Reese, another teacher, also completed a report that month. (Tr. 383.)  Mr. Reese explained that Claimant had become a leader in math class, although his math computation skills were behind grade level. (*Id.*)  Claimant completed assignments that were to be done at home. (*Id.*)  Claimant sometimes "zoned out" when he was supposed to be listening, but his attention and ability to complete assignments had improved. (*Id.*)  Claimant could improve his organizational skills and neatness. (*Id.*)  He was respectful to adults and got along with his peers. (*Id.*)

In April 2012, Claimant's grandmother reported to nurse Dull that he continued to have some trouble completing school work. (Tr. 329.)  Claimant's aggression toward his brother was a major issue. (*Id.*)  Nurse Dull suggested discipline techniques and separating the brothers. (*Id.*)  The nurse increased Claimant's Intuniv prescription to address Claimant's issues with focus and agitation. (*Id.*)

Claimant did not attend his May 2012 appointment with nurse Dull due to an emergency. (Tr. 328.)  In June 2012, nurse Dull noted that Claimant had been off of his medications for three to four days because his family lost his medication bottle. (Tr. 327.)  Since restarting the medication, Claimant had been tired during the day. (*Id.*)  About four days prior, after a confrontation with his mother about cleaning his room, Claimant began to pull out his hair and scratch himself. (*Id.*)  By July 2012, Claimant had stopped pulling his hair and had been making an effort to eat different foods. (Tr. 326.)  Nurse Dull noted that Claimant was more engaged in conversation than usual. (*Id.*)

In May 2012, Ms. Mulaney conducted IQ and academic testing. (Tr. 385-90.)

7

Claimant obtained a full scale IQ score of 80, placing him in the low average range of intelligence. (Tr. 385.)  Ms. Mulaney made suggestions to improve Claimant's reading, writing, and math skills. (Tr. 390.)  Claimant was deemed eligible for special education due to specific learning disabilities. (Tr. 395.)

During February 2013, Claimant's grandparents saw nurse Dull without Claimant. (Tr. 460.)  They reported that he was taking his medication only three times a week and indicated that they did not give his medication daily because of variable responses and greater agitation. (*Id.*)  Claimant had been getting into more fights at school and crying more often. (*Id.*)  Nurse Dull recommended stopping all medication and reassessing Claimant in a few weeks. (*Id.*)  He commented that the family had not attended any counseling service since early November 2012 and stressed the need to come more frequently for results. (*Id.*)  Claimant's grandparents indicated that they felt therapy did not work and reported that one barrier to their attendance was the grandfather's health issues. (*Id.*)

On March 28, 2013, James Stoops, Ph.D., noted reports that Claimant was doing poorly in the fourth grade and his family was frustrated that he did not have an IEP. (Tr. 459.)  They were also frustrated with Claimant's medications, although they indicated that the medication was working well earlier in the school year. (*Id.*)

In July 2013, nurse Dull noted that he had not seen Claimant's family since March and had not seen Claimant for even longer. (Tr. 462.)  Claimant's grandmother reported that toward the end of the school year, Claimant had become more easily upset and angered. (*Id.*)  He was more physical with his brother, had voiced suicidal

8

ideation, experienced auditory hallucinations, threatened self-harm while holding a knife, tried to exit a moving car, and left his home on several occasions stating that he needed to get away. (*Id.*)  Nurse Dull recommended an antidepressant, stressed the need for Claimant's family to call with concerns about medication rather than stop medication as they had done in the past, and emphasized the need for Claimant to start attending therapy sessions. (*Id.*)

On August 19, 2013, nurse Dull indicated that Claimant's moods had improved and he was calmer, isolating himself less, and not as sad and irritable. (Tr. 463.)  Claimant's auditory hallucinations had ceased. (*Id.*)  Claimant was regularly taking his medication, but it caused fatigue during the day. (*Id.*)  He was still staying up late. (*Id.*)  Nurse Dull recommended that Claimant take his anti-depressant around bedtime. (*Id.*)

In September 2013, Claimant's grandmother returned to nurse Dull without Claimant, because he was sick. (Tr. 464.)  Claimant was still irritable and cried without provocation, but did not experience auditory hallucinations or express thoughts of self-harm. (*Id.*)  His school performance was fair, aside from one altercation with a teacher. (*Id.*)  He was taking his medication daily. (*Id.*)  Nurse Dull reminded Claimant's grandmother of the importance of therapy, which Claimant had not attended since June. (*Id.*)  Nurse Dull increased the dosage of Plaintiff's antidepressant. (*Id.*)

In November 2013, Claimant was verbal in a counseling session[1] about being bullied at school. (Tr. 465.)  Claimant quickly became uninvolved in the discussion when it turned to looking for solutions and examining his role in the problem. (*Id.*) The

---

[1]     The counseling note does not indicate who conducted the session. (Tr. 465.)

9

counselor supported Claimant's grandmother's desire to look into a school that supported children with emotional difficulties. (*Id.*)  The counselor commented that at least Claimant was willing to be involved in attending his current school and get along with peers and teachers, rather than spend most of the day at home playing video games or sleeping as he did while enrolled at Akron Digital Academy. (*Id.*)

On January 9, 2014, Dr. Stoops completed a form concerning Claimant's mental limitations. (Tr. 454-57.)  Dr. Stoops indicated that he began treating Claimant in October 2010. (Tr. 454.)  He opined that Claimant had marked limitations in the following domains:

- Acquiring and using information -  Dr. Stoops noted that Claimant needed assistance with reading, writing, spelling, and capitalization and overall had significant difficulty in putting his thoughts on paper at an age-appropriate level. (*Id.*)

- Attending and completing tasks - Dr. Stoops explained that Claimant had difficulty focusing in school and had a special education teacher working with him in a separate classroom. (Tr. 455.)  Claimant's ability to focus was three to four years below his age level. (*Id.*)

- Interacting and relating with others - Dr. Stoops indicated that Claimant had a hard time complying with rules at home and school, wanted everything to be his way, had many difficulties interacting with classmates, verbally and physically abused his younger brother, and accepted no personal responsibility for his behavior. (*Id.*)

- Ability to care for himself - Dr. Stoops explained that Claimant could maintain his possessions, but let his room become messy when he lost interest. (Tr. 456.)  In addition, Claimant's school reported that he was unable to follow the dress code. (*Id.*)

Dr. Stoops also opined that Claimant had a moderate limitation in health and physical well being due to withdrawing, crying, and fighting with others when he became emotionally upset. (*Id.*)  Claimant also asked to take extra medication when he was

10

under stress. (*Id.*) In concluding his report, Dr. Stoops noted that Claimant had an IEP at school for reading, math, and writing, along with a special education teacher for part of the day and small group instruction. (*Id.*)

In February 2014, Alysia Looman, Claimant's language arts and social studies teacher, completed a questionnaire. (Tr. 250-51.)  Claimant was in the fifth grade. (Tr. 250.)  Ms. Looman wrote that Plaintiff had difficulty paying attention, did not always follow instructions or work well independently, did not respond to change or criticism, and was not progressing in math or writing. (*Id.*)  She also reported that Claimant exhibited inappropriate aggressive behavior toward other students and adults. (Tr. 451.)  As an example, she indicated that Claimant yelled at others and threw items. (*Id.*)

### C.    Agency Assessments

On January 11, 2012, Frederick Leidal, Psy.D., examined Claimant. (Tr. 309.)  Claimant's mother reported that she did not know much about his conditions, but that he had attention deficit disorder ("ADD") and depression. (*Id.*)  Claimant's grandmother reported that Claimant had been diagnosed with ADHD and his medication was "very helpful." (*Id.*)  Claimant lived with his grandparents and attended school at Akron Digital Academy twice and week and otherwise completed school work at home. (Tr. 310-11.)  He did not have an individualized education program ("IEP") at Akron Digital Academy. (Tr. 311.)  Claimant's grandmother reported that he had mood swings and made threats of suicide when he did not get his way. (Tr. 310.)  Claimant often went to sleep at one or two in the morning and woke up at two in the afternoon. (*Id.*)

After a mental status examination, Dr. Leidal reported that Claimant was alert

11

and well oriented. (Tr. 311.)  He was cooperative and behaved in an age-appropriate manner. (*Id.*)  Claimant had fairly normal language use and did not display any marked impairment in attention. (*Id.*)  Claimant's "fund of information" was below average and his general intelligence was in the borderline to low average range. (*Id.*)  Claimant's affect and facial expressions were within normal limits and his mood was stable, without any signs of lability, anxiety, or depression. (*Id.*)  Dr. Leidal diagnosed ADD and disruptive behavior disorder. (Tr. 312.)  He opined that Claimant had: (1) a below average ability to acquire and use information, (2) a below average to fair ability to attend to tasks, (3) a fair ability to interact and relate to others, and (4) a fair ability to perform self-care. (Tr. 313.)

On January 30, 2012, Caroline Lewin, Ph.D., conducted a review of the record to assess Claimant's mental limitations. (Tr. 88-89.)  Dr. Lewin opined that Claimant had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. (Tr. 88.)  She found that Claimant had no limitations in the domains of moving about and manipulating objects, as well as health and physical well-being. (Tr. 88-89.)

On August 28, 2012, Leslie Rudy, Ph.D., conducted a second review of the record. (Tr. 98-99.)  She affirmed Dr. Lewin's findings. (*Id.*)

**D.    Hearing Testimony**

At his January 2014 administrative hearing, Claimant testified that he was 11-years-old and attended school in person for the past two years at Imagine Leadership Academy. (Tr. 41.)  He was in the fifth grade. (*Id.*)  He received grades of A's and B's.

(*Id.*)  Claimant got along with his teachers and classmates. (Tr. 42.)  At home, Claimant enjoyed playing card, computer, and video games with his younger brother and watching television. (Tr. 43.)  Claimant sometimes had physical fights with his sibling. (Tr. 46.)

Plaintiff also testified at Claimant's administrative hearing. (Tr. 47.)  She testified that Claimant was currently taking Zoloft, and had previously taken Strattera, which was discontinued because it made Claimant angry and irritable. (Tr. 51-52.)  Zoloft better managed Claimant's symptoms. (Tr. 53.)  Claimant had been removed from the school bus on a few occasions that year and fought with peers at school. (Tr. 53-54.)  He got along well with his brother most of the time, but would have a physical fights with him almost every day late in the evening. (Tr. 54.)  Claimant was always sad and often experienced mood swings. (Tr. 55.)  Claimant's grades were mostly C's and D's, although he had A's and B's in a few classes. (Tr. 58.)  He was held back for one year in kindergarten. (*Id.*)  Claimant attended counseling with nurse Dull or Dr. Stoops approximately once or twice each month. (Tr. 61.)  A few months prior, Claimant had developed a bald spot on his head, because he had pulled out his hair. (Tr. 63.)  Not long before the hearing, Claimant had shaved off his eyebrows. (*Id.*)  Claimant had also held a knife to his stomach and threatened self-harm. (Tr. 65.)

### III.   STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled if he has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has

13

lasted, or can be expected to last for a continuous period of not less than 12 months.

*See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F.

App'x 146, 147 (6th Cir. 2002) (per curiam).  There is a three-step analysis for

determining whether a child-claimant is disabled.  First, the Commissioner must

determine whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. §

416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Second, if the child is not

engaged in substantial gainful activity, the Commissioner must determine whether the

child suffers impairments or a combination of impairments that are "severe" and that are

expected to result in death or have lasted or are expected to last for a continuous

period of not less than 12 months.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*,

37 F. App'x at 148.  Third, if the child suffers a severe impairment or combination of

impairments that meet the Act's durational requirement, the Commissioner must

determine whether they meet, medically equal, or functionally equal an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. §

416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  If the child's severe impairment or

combination of impairments meets, medically equals, or functionally equals an

impairment in the Listings, the child will be found disabled.  *See* 20 C.F.R. §

416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.

　　　To determine whether a child's impairment functionally equals the Listings, the

Commissioner assesses the functional limitations caused by the impairment in six

domains of functioning:  (1) acquiring and using information; (2) attending and

completing tasks; (3) interacting and relating with others; (4) moving about and

manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant was born on July 20, 2002. Therefore, he was a preschooler on September 22, 2011, the date the application was filed, and is currently a school-age child.

2.   The claimant has not engaged in substantial gainful activity since September 22, 2011, the application date.

3.   The claimant has the following severe impairments: attention deficit hyperactivity disorder, learning disorder, and oppositional defiant disorder.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6.   The claimant has not been disabled, as defined in the Act, since September 22, 2011, the date the application was filed.

7.   The claimant is not entitled to retroactivity of child's survivor benefits prior to April 2012.

(Tr. 13-22.)

### V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ.  *Id.*  However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.

### B.    Plaintiff's Assignments of Error

### 1.    The ALJ's Treating Source Analysis

Plaintiff maintains that the ALJ erred in failing to rely on the opinion of Claimant's treating psychologist, Dr. Stoops.  In January 2014, Dr. Stoops opined that he had

treated Claimant since October 2010 and that Claimant suffered from marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. (Tr. 454-56.)

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence. *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id*.

The ALJ afforded little weight to Dr. Stoops' opinion, explaining that (1) Dr.

Stoops' opinion was inconsistent with his clinical observations and findings, (2) that the opinion was not supported by school records, and (3) that Dr. Stoops failed to consider Claimant's noncompliance with his treatment regime.[2] (Tr. 15.)  The ALJ's observations are substantially supported in the record.

Dr. Stoops' clinical notes and findings do not adequately support the marked limitations the doctor identified.  In March 2013, Dr. Stoops noted that Claimant was performing poorly in the fourth grade and there were issues with bullying at Claimant's school. (Tr. 459.)  The physician did not assess any functional limitations or otherwise include observations that would support significant impairments in various functional domains.  Plaintiff does not direct the Court to any further treatment notes from Dr. Stoops.  Dr. Stoops' assessment of Claimant's functional equivalence does not include clinical observations that would support the degree of limitations he recommended. (Tr. 454-57.)

Immediately preceding his discussion of Dr. Stoops' opinion, the ALJ discussed and cited to school records that do not comport with the limitations Dr. Stoops identified.  As the ALJ explained, around 2012, the Claimant showed progress in school: he was achieving higher grades, his reading and comprehension abilities had

---

[2]     The ALJ also observed that the limitations Dr. Stoops offered would generally warrant hospitalization and there had been none in this case. (Tr. 15.)  This statement is speculative, but because the other reasons the ALJ provided for discounting Dr. Stoops' opinion are substantially supported, there is no reason to remand based on this statement. *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).

improved, and he was completing school work. (*Id.*)  The ALJ cited to reports from Ms. Sivak and Mr. Reese that reflect such improvement in Claimant's class work and conduct. (Tr. 15, 381, 383.)

In his opinion, Dr. Stoops did not consider Claimant's noncompliance with treatment.  Given the various issues other medical providers identified with regard to noncompliance, the doctors' failure to address compliance calls into question the accuracy of his opinion.  The ALJ explained that the record reflected Claimant's failure to attend medication management appointments and irregular attendance at therapy, and that the Claimant's caretakers failed to keep Claimant on prescribed medication. (Tr. 15.)  Among other evidence, the ALJ cited to a July 2013 treatment note in which nurse Dull discussed a significant gap in Claimant's treatment, stressed the need for Claimant's family to report concerns regarding medication rather than stop medication as they had done in the past, and emphasized the need for Claimant to restart therapy. (Tr. 15, 462.)

Plaintiff argues that the record supports Dr. Stoops' findings and demonstrates that Claimant suffered from marked limitations in five domains. (Pl.'s Brief at 9-10.) Even if Plaintiff did provide evidence to support her argument of marked limitations, the existence of such evidence alone would not be an appropriate reason to reverse the ALJ's decision: An ALJ's decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy, 594 F.3d at 512*.  The ALJ's opinion provide substantial support for the ALJ's conclusion that Claimant did not have marked limitations:

- The ALJ assessed that Claimant experienced significant improvement

19

with adequate treatment. (Tr. 14.)  He was better able to express his feelings, follow directions, handle conflict, and respect authority. (Tr. 14-15.)  He exhibited decreased anger, increased motivation, and appeared calmer. (Tr. 15.)

- The ALJ found that in 2012 the Claimant showed progress in school with better grades, increased reading and comprehension abilities, and completing school work. (Tr. 15.)

- The ALJ noted that Claimant's teacher described him as mature and polite. (Tr. 19.)  Claimant related cooperatively and well during his consultative examination with Dr. Leidal. (*Id.*)

- The ALJ observed that although Claimant engaging in activities that could be harmful to himself, had difficulty going to sleep, and preferred certain foods, he showed improvement on medication. (Tr. 21.)  Claimant was able to dress himself, prepare meals, care for his pets, and complete some household chores. (*Id.*)

- The ALJ attributed great weight to the opinions of the state agency reviewing physicians who opined that Claimant had less than marked or no limitations in all of the domains. (Tr. 16, 88-89, 98-99.)

The reasons the ALJ rejected Dr. Stoop's opinion are clear from the opinion as a whole.  The fact that the ALJ provided some of this analysis before addressing Dr. Stoops' opinion and his analysis of the individual domains does not necessitate remand of Claimant's case.  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  Accordingly, Plaintiff has not presented a basis for remand based on the ALJ's treating source analysis.

20

### 2.    The ALJ's Reliance on Claimant's Noncompliance and Reports of Improvement

Plaintiff argues that the ALJ erred in concluding that Claimant was not compliant with treatment.  Plaintiff maintains that good reason existed for any noncompliance and that S.S.R. 96-7p requires the ALJ to consider any reasons offered for a claimant's failure to pursue treatment.  The Commissioner contends that the ALJ properly considered Claimant's noncompliance as well as Claimant's improvement when rendering his credibility assessment.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs., 823 F.2d 918, 920 (6th Cir. 1987); Villarreal v. Sec'y of Health & Human Servs., 818 F.2d 461, 463 (6th Cir. 1987).* However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  *See Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 249 (6th Cir. 2007); Weaver v. Sec'y of Health & Human Servs., 722 F.2d 313, 312 (6th Cir. 1983).*  The ALJ also must provide an adequate explanation for her credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

21

The ALJ provided a number of reasons in support of his conclusion that statements concerning the intensity, persistence, and limiting effects of Claimant's symptoms were not entirely credible. For instance, the ALJ explained:

- Claimant experienced improvement with adequate treatment in regard to expressing his feelings, following directions, handling conflict, showing greater respect to authority, and remaining calm. (Tr. 14-15.)

- Claimant failed to attend various medication management appointments and had irregular attendance at therapy. (Tr. 15.) Claimant's caretakers had failed to keep Claimant on prescribed medication. (*Id.*)

- Claimant's performance in school improved with accommodations initiated in 2012. (*Id.*)

In his opinion, the ALJ cited to and relied on the following evidence that substantially supports his credibility determination:

- A July 2009 therapy noted indicating that attendance issues continued to persist and that Claimant had difficulty building and growing a therapeutic relationship when he was seen less than once a month. (Tr. 15, 324.) When a therapist attempted to discuss concerns regarding attendance with Claimant's grandmother, she became angry and requested a new therapist. (*Id.*)

- A January 2010 treatment note in which Claimant's grandparents reported that he made great progress in identifying and expressing his feelings, his behavior at home, and his performance at school. (Tr. 15, 289.) They also indicated that Claimant had increased self-esteem. (*Id.*) Another treatment note from May 2011 stated that Claimant's anger issues continued to decrease and Claimant's sleep had greatly improved with the use of Melatonin. (Tr. 15, 306.)

- Treatment notes from June 2011 indicating that Claimant two missed appointments without reason. (Tr. 15, 302-03.)

- A January 2012 report from Claimant's grandmother that Claimant was doing fair in school, completing his work, sleeping well, and making no further comments about self-harm. (Tr. 15, 335.) She also reported improvement with medication. (Tr. 15, 309.)

- A March 2012 report from Claimant's grandmother that she did not give

22

Claimant his medication on a daily basis. (Tr. 15, 377.)

•     Ms. Sivak's report that Claimant was doing well in class, was mature and polite, and attended well to his work. (Tr. 15, 381.)  He had improved greatly in reading and remaining on task. (*Id.*)  Claimant participated enthusiastically and got along well with others. (*Id.*)  Mr. Reese's report that Claimant completed his homework, his attention had improved, and he behaved well with adults and peers. (Tr. 15, 383.)

•     A July 2013 treatment note where nurse Dull indicated that he had not seen the Claimant's family since March and had not seen Claimant for even longer. (Tr. 15, 462.)  Nurse Dull stressed the need for Claimant's family to call with concerns about medication and not stop Claimant's medication as they had done in the past. (*Id.*)  The nurse emphasized that Claimant needed to attend therapy sessions. (*Id.*)

•     In August 2013, Claimant's grandparents reported that he was taking his medication daily. (Tr. 15, 463.)  His mood was improving: he was calmer, isolated himself less, and was not as sad or irritable. (*Id.*)

S.S.R. 96-7p permits the ALJ to consider a claimant's improvement with medication and other treatment when assessing credibility.  S.S.R. 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  Various statements from care providers, teachers, and Claimant's family members support the ALJ's conclusion that with appropriate treatment, Claimant experienced improvement.

S.S.R. 96-7p also provides that an individual's statements may be less credible if records show that the individual is not following treatment as prescribed and there are no good reasons for this failure. *Id.* at *7.  The Ruling directs the ALJ to "consider" any explanations the individual may provide that may explain infrequent or irregular medical visits or the failure to seek treatment. *Id.*  Here, Plaintiff contends that good reason existed for Claimant's failure to follow treatment and points to: (1) a March 2011 treatment note stating that Claimant had not attended therapy in over 70 days due to stress in his home, and (2) reports that Strattera caused harsh side effects. (Pl.'s Brief

23

at 12.)   Plaintiff, however, does not direct the Court to evidence that accounted for Claimant's failure to attend treatment on numerous occasions after March 2011. The ALJ cited to evidence reflecting Claimant's failure to attend treatment without reason. (Tr. 15, 324, 302-03, 462.)  In regard to medication, the ALJ relied on evidence showing that nurse Dull did not approve of Plaintiff taking his medication inconsistently. (Tr. 15, 460, 462.)   Accordingly, the ALJ properly relied on Claimant's noncompliance and improvement with treatment.

In support of her argument, Plaintiff also cites 20 C.F.R. § 404.1530 and Social Security Ruling ("S.S.R.") 82-59, which address a claimant's failure to follow prescribed treatment. Plaintiff argues that the ALJ ought to have examined whether the Claimant understood the nature of his treatment in relation to his disability claim, and further inquire into the reasons for failing to adhere to his doctor's orders.  This argument lacks merit as 20 C.F.R. § 1530 and S.S.R. 82-59 do not apply to Plaintiff's case.  S.S.R. 82-59, codified at 20 C.F.R. § 1530, provides that a claimant *who would otherwise be found disable*, but who does not follow treatment prescribed by his physician that can restore his ability to work, must have a good reason for not following the prescribed treatment in order to be found disabled. S.S.R. 82-5, 1982 WL 31384, *1 (1982).  The Ruling further sets out the requirements necessary for a finding of failure to follow prescribed treatment, including further inquiry into the specific reasons for not following the prescribed treatment. *Id.*  However, "[f]ailure to follow prescribed treatment becomes a determinative issue only if the claimant's impairment is found to be disabling under steps one through five and is amenable to treatment expected to restore her ability to work." *Hester v. Sec'y of Health & Hum. Servs.*, 886 F.2d 1315, 1989 WL

24

115632, *3 (6th Cir.1989).  This Court and courts in this Circuit have held that a finding

that a claimant has a disability is necessary to trigger an analysis under S.S.R. 82-59.

Williams v. Comm'r, Soc. Sec. Admin., No. 3:13-CV-1276, 2014 WL 1406433, at *13

(N.D. Ohio Apr. 10, 2014) (Zouhary, J., adopting the Report & Recommendation of

White, M.J.) (collecting cases).  The ALJ did not determine that the Claimant was

disabled and there was no prior disability ruling.  Therefore, S.S.R. 82-59 does not

apply to the facts of this case.  For the foregoing reasons, the Court finds that the ALJ

properly considered Claimant's improvement and noncompliance, and Plaintiff's second

assignment of error does not present a basis for remand.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED for proceedings consistent with this

opinion.

s/ Nancy A. Vecchiarelli          
U.S. Magistrate Judge

Date: February 3, 2016


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See United States v. Walters, 638 F.2d 947 (6th Cir. 1981); Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**